Our next case is Starke v. SquareTrade. The plaintiff in this case is a serial class-action plaintiff who brought suit against SquareTrade alleging that SquareTrade engaged in unfair business practices by delivering him a contract after the purchase via a confirmation email that differed from the sample contract that was available to him on the website at the time of purchase. These are the exact words of the complaint, paragraph 29. The confirmation email from SquareTrade sets out the general contract terms and provides a link or other access to the terms and conditions of the protection plan. Paragraph 30, paragraph 76 makes the exact same assertion of fact that the confirmation email includes a link to the plan, to the terms and conditions of the plan. It was only after SquareTrade moved to compel arbitration that Mr. Starke contended that no reasonable person could understand that the link to the terms and condition in that email was a link to the plan. Starke is bound. There are two primary questions. The first is a reasonable notice, but the second is assent, and is it fair to say that even though there's that term and conditions hyperlink, there is, in fact, no requirement that any purchaser of this particular product would have to assent, would have to agree? Essentially what you're suggesting is that because there's this notice on the bottom, there's a recognition that that's essentially a waiver, that is assent, and my question is why don't you just have something which requires the particular buyer to exhibit their assent? So the buyer in this case exhibits their assent by accepting the benefits of the contract, keeping the contract, and not returning it, and if you look at the page, the selling page when he purchased, it says there right up front, we're going to send you a contract. If you don't want to keep the contract, you can return it within 30 days for a full refund. Why does that first page then have a hyperlink to terms and conditions? Sorry? I'm sorry? This is not a new question in this case, right? Why does that first page where you put it in your shopping cart and you pay, that advertisement has a hyperlink to terms and conditions, and if you had clicked on the hyperlink, there's an arbitration clause. Why would you have that hyperlink when you buy it if it's going to say, well, this is meaningless, it's what you're going to get later on that governs this agreement? Why do you put in terms and conditions in the initial page? The terms and conditions are linked on the website. The whole structure of this, the way in which this business has been run, and it's run according to state law, which says, under 7903 of the New York insurance law, which is very, very similar throughout the country, that if you are in a store, you need to provide the person with the contract right there on the spot. If you are outside that physical environment, you can do it this way. It's exactly, it's been done, it's done this way all over the country, and it's structured that way, given the nature of the statute. And this is, and I understand the statute. Well, my question is a little more focused than that, is that I get it if you would put on that first page, and we're going to send you the terms and conditions of this agreement later, tomorrow, when we get that confirmation email sent out. But if you have on that first page a hyperlink to terms and conditions, and they're extensive, and it has no arbitration clause, why wouldn't a reasonable purchaser think, well, this is the contract I just paid for? Because the description right there, as you just said, is that the contract is going to come to you by email the very next day. The terms and conditions that you get from, on the Amazon website ought to have a disclaimer saying, do not click on this, because these aren't the terms and conditions. The terms and conditions are going to be a switch from the bait that these terms and conditions tell you are the actual terms and conditions. Of course that's not what it should say. There is obviously... Really tell me why it shouldn't, tell me why it obviously shouldn't say that. Obviously here, there was a mistake. This is no dispute. There was a mistake. When Square Trade updated its terms and conditions, Amazon did not update the link. And when this case was filed, that mistake was corrected. And Mr. Klein will tell you it wasn't corrected because after we corrected it, there were still some other Amazon links that were not corrected, and that is because Amazon has two programs, the program of Square Trade sales and the program of Kindle sales, a Square Trade program that Amazon runs itself. And they're apparently run by two different people, and so when they corrected the first one, they didn't correct the second one. When we learned that, we got it all corrected. So... Wouldn't it all be a lot easier? I mean, this is not like in the store, it seems to me. In the store, I look at a sample item, and I think, oh, that's a pretty good item. I'm going to buy it. And there's going to be an arbitration clause, it will turn out, that is in the box that I don't see until I get home. I did not think it was the law that the store has to show me a pamphlet identical to the one that's in the box before I buy the product. I thought the shrink-wrap rule was when I get home and open the box, I find the terms. And that makes a lot of sense in that context because otherwise, it's the store rather than the manufacturer who gets to set the terms because if the store fails to give you the pamphlet, now suddenly we've got a problem. But here, there is no problem because everything could be done correctly on the website from the start. Why isn't that a different situation than the one that takes place with sales of physical items in brick-and-mortar stores? What keeps a company from being able to not make mistakes and make sure that what the terms and conditions are are there and a person has the opportunity to read them? Granted, a lot of people aren't going to read them, but then you're clear because you've given them the opportunity to read this and if they don't read it, it's on them. Right. And there are many, many ways that Uber could have structured its webpage to make it stronger, clearer, higher, more upfront. And this court didn't say, well, it could have been better. It could have been a bigger link. You could have had the person scroll on the terms of use and then say at the bottom, I agree. All of those things could have been true, but it wasn't that way. In this case, why wouldn't a reasonable consumer looking at what was sent say, oh, I see, this is the contract. I've got the coverage amount. I understand what that is. I've got the coverage term. I've got the price. It says what's covered. Now I've got my contract and it seems fine to me. Why were they going to see terms and conditions and think, oh, that's where the real contract is? Because if you look at that one-page email where there are only two hyperlinks and where there is a summary of the terms, it says, for example, coverage. Okay? It just says coverage, coverage type, standard. That's the coverage. What does that mean? What is the coverage? What happens when the product breaks? I have to recognize that that and, of course, you're now telling me that the last time I saw one that said terms and conditions, I should have ignored that because that doesn't mean anything. And, of course, there are many links here which have things like login in a giant box, write a review in a red box that are far more prominent. Even need help gets a more prominent mention than the thing that you're saying is the most important thing the person should look for, the contract itself. It is one of the important things that the consumer should look for, and if you look at these cases, they don't demand that the retailer make the notice the most prominent, the most significant item in the consumer's view. There is a recognition that these are private parties structuring their relations where the retailer has the right to order the information to provide what it thinks is going to be of reasonable relevance to the consumer. And if you, the premise that the, you have to start from the notion that this is in many ways easier than the Meyer case, it's easier than the Uber case, right? I came to the court today by Uber, okay? I get in, they take me to the court, I get out, I know they're going to take money from my credit card, and then I'm done. As far as I'm concerned, Uber and I are complete. Why do we have these cases that talk about where the sign-in is, where the terms and conditions are? Because if you don't have it in a certain way, I won't even know there's a contract here. But here it's clear there's a contract. Let me ask you about Uber then. So when you signed up for Uber, you would have gone through the contractual arrangement, and they would have described to you probably the terms and conditions, and they would have laid out specifically what Uber requires in terms of conditions, and you then probably, my guess is, would click on some particular spot in which you say, yes, I assent to those particular conditions. That's not what happened here. And that's not what happened in Uber, Your Honor. In Uber, it's not at all. In Uber, you click on register. You register for the service, and below that it says, by registering, in very, very small print, and I would ask you to take a look at the Uber page. It's on page 27 of their brief. It's really small. It says, by registering, you agree to the terms of service. There's no click I assent. And this court upheld that. And I would say this is an easier case because in there, you needed to tell the consumer there was a contract. Here, he knows there's a contract. He's admitted there's a contract. And if you look at the Schnabel court, this court's decision, the Schnabel decision, the court discusses the duty to read and the online context. Of course, in Uber, it does say, by creating the account, you agree to the terms and service. It doesn't say on your page, if you don't send us back a rejection, you've agreed to the following terms and conditions, hyperlinked. Yes, and I agree with that. The Uber has the lead-in phrase. In the Uber case, that lead-in phrase is extremely small. It's very, I mean, I was, I must say, struck again in getting ready how tiny it is, and this court upheld it. Particularly on a phone, it would be very small. Particularly on a phone. And if you look at what the Uber court said in the Facebook decision, it quoted the Facebook decision that said, in today's world, terms and conditions is a sign that says, click here for important contractual terms. And they say, for people who are savvy in the Internet, Mr. Stark had purchased eight of these from Square Trade in an 18-month period. Yeah, maybe each time he made the same mistake. But can I ask one question? There's a more profound problem with this contract, isn't there, that there was a mutual mistake, it seems to me, about what Mr. Stark was buying, in the sense that he thought that he was covering the product that he bought in Best Buy or Staples or wherever he bought it. And presumably, so did Square Trade. I mean, Square Trade didn't think, we're taking this premium from this guy to cover nothing. Somehow, if a machine can think, whatever is happening here, Square Trade must be assuming that he's paying to cover a product that is covered. But that turned out to be wrong. And then I take it, I think I have this right, I don't think this is about settlement negotiations, I think Square Trade offered to give him his money back, right? Square Trade did give him his money back, and I'm pretty sure he canceled, he cashed the check. And if you look at Joint Appendix 70, the actual contract says, if this protection plan was inadvertently sold to you on a product which was not intended to be covered by this protection plan, we will cancel this protection plan and return the full purchase price of the protection plan to you. That was not subject to the 30-day limit. No, absolutely not. I guess what I'm wondering is, why is there any contract here at all? Is the problem that it's a voidable contract and not void, given that mistake, and that Mr. Stark somehow is claiming that he didn't actually cancel it? But if he took the money for the refund, why isn't the whole case over at that point? That's not an argument that I saw you make in the brief, but why are we even here? Maybe I should ask Mr. Klein that. But you didn't make that argument, I take it. Yes. They have unfair competition claims, and their claiming the whole thing is somehow an intentional fraud, that sort of thing. Let's even assume it is. I'm still having trouble understanding why, and I know you don't want to. I agree with you. I'm trying to figure out why Mr. Stark becomes an appropriate plaintiff here if, in his case, there was no contract ever, really. There was no product that was covered. It was all a mistake on everybody's part, and then your company gave him his money back and effectively canceled the contract. What's deceptive? Maybe you deceived somebody else. Let somebody else come and sue you. I agree, and I certainly will get there on the merits, whether we're doing it in court or we're doing it in arbitration. I agree with you 100%. I've gone way over whatever time I reserved, so I apologize. You still have a couple minutes left for rebuttal. Mr. Klein. Good morning, Your Honor. It's Solomon Klein, counsel for Mr. Stark. I'll get to the question that was immediately raised. The Amazon and Amazon, part of the issue was that that notice was at the bottom of the e-mail, at the bottom of the purchase page, and was not given prior. There was no proper disclosure of that. So as far as whether or not Mr. Stark has an agreement, the terms and conditions that provided that language that would have allowed them to cancel only came afterwards, in the terms and conditions that was imposed in the post-sale e-mail at the link at the very bottom. There was some notification that, in fact, you have to buy the product from Amazon, and I thought the plaintiff had received that at some particular point. Is that not right? That's not correct. It was on the purchase page, way below, several screens down, there was a notice, but there was nothing at any place where the reasonable consumer would have seen it prior to purchase. So that there was a notice, it's just that you're suggesting it was not visible enough. There's a notice that, in fact, you have to be an Amazon customer to be able to receive it. Correct, correct. And again, I believe the . . . But going back to the overall case here, the mayor gave us really the framework for how to actually do it right. This is the case where the court has an opportunity to say how not to do it. And that is, at the very outset, when Squirtric presented the sale, you had the terms and conditions at the bottom that did not have an arbitration agreement pre-sale. It wasn't even referred to as terms and conditions. Let's remember, there is no document titled terms and conditions prior to the sale. There is a reference to a service contract, and then at the bottom of the purchase page, or several screens down, there is a link titled Warranty PDF. The nomenclature of terms and conditions did not show up at all until after the initial . . . after the purchase, there was an email from Amazon, not from Squirtrate . . . and you clicked on Warranty connected to terms and conditions. That would take you to the pre-sale terms and conditions. But in terms of the language that the consumer would see, there was no reference to a terms and conditions document prior to sale. So how can we impute to your client that he read any of it? He said, I didn't click on any of this, right? Correct. Why would a reasonable consumer have clicked on any of it? I agree, and in fact, we have a very interesting case where it's actually the seller and the creator of the adhesion contract that's claiming . . . that's saying, nobody reads this stuff, it doesn't matter. We'll just pick whichever one we like, and whichever one has better language to hold the consumer to. And what Mayer does, indeed Mayer . . . a corollary to Mayer is, and this addresses the question about the link in the opening . . . in the pre-sale, the link to the . . . I'm sorry, the link in Mayer was somewhat smaller text than the rest of the page. But what the corollary to Mayer is, is that a consumer in this century . . . and in the current environment of e-commerce, understands the concept of . . . that around the space where there is a button, link to log in, to register, whatever it might be . . . there is, there will be, and the customer needs to be on the lookout . . . should she choose to read it, for that link. And the corollary to that is that when you don't have it . . . you've lost the ability to give reasonable notice to the consumer. And that's exactly what happened here. At every stage, the language . . . for example, in many, in some of the cases where you do see the court expecting . . . the consumer to look at, or click at the link, or be bound by it . . . you have strong language saying, you must read, understand and agree to these . . . to the following terms and conditions with a link to it. You will have graphical signs addressing . . . pointing the consumer to the terms and conditions link. Can I ask you about Judge Weinstein's approach? This was adopted by the District Court here. Berkson? Yep. Suggests a whole list of factors, which you consider. This was written, supported by Judge Weinstein. What do you think about the factors that were used by the District Court here? And do you think this would be a viable approach to this kind of adhesion contract? I think in many ways, it's really . . . I think the Mayor took a bit of a holistic approach and more of a common sense . . . rather than a factoring approach. And Judge Weinstein broadened the concept to more specific factors. But it's really one of the same. And Judge Gariffas went through the facts of the confirmation email that had the link at the bottom . . . in the same way that the Court and Mayor ultimately did. Is it cluttered? Are there other signs pointing away the consumer, directing the consumer's attention to the link? I should add one thing. That one thing that Berkson doesn't do and Judge Weinstein doesn't do . . . is the temporal coupling. He presumes that the consumer will be looking for these terms and conditions at the time of the sale. So, in fact, Judge Gariffas, in his opinion, kind of gave the Square Trade the benefit of the doubt . . . that we'll look at just the spatial coupling. Because Judge Weinstein did not even mention the word shrink-wrap . . . except to explain the historical . . . the history of this concept. But, the idea of an electronic shrink-wrap where you click . . . but there's no spatially coupled link at the time of the transaction . . . is completely foreign to Berkson. It's not even mentioned. And, so Judge Gariffas, when he applied the factors in . . . from the four factors . . . to the consumer connecting the notice and the terms and conditions to the contract itself. Is it the case that, as Mr. Winthrop suggested, that the company returned your client's payment and he cashed the check? No. It was not . . . they did not . . . after the case was filed . . . the company issued some kind of automatic credit. It was not either through the credit card or the way it was purchased. It's not something that . . . certainly not prior to the case. But, even though they said it will be returned, it was not returned. What does that mean? Well, I think it means nothing. I mean, did they send him a check that he deposited in his bank? Or, did they give him credit for another Square Trade extended warranty? Or, what did they do? And, what did your client do? I believe . . . my client did not do anything. Meaning, in whatever way it was returned, if it was a check, he did not cash it. But, I believe it was not a check. It was either a credit card . . . it was something that was not in his control. Square Trade either . . . it had . . . Either . . . I believe so. It was something like . . . for an odd amount. Meaning, not for the same amount that he . . . It wasn't $4.34? No. I don't remember. I frankly don't even remember whether it was more or less. But, it was some number that we don't quite understand how it got there. Just to nail it down, whatever you remember or don't remember, or whatever your client may have told you, or whatever their company says happened, is any of that in the record? About whatever refund was made? I believe not. I believe not, but I . . . Certainly, we did not place anything in the record other than the fact that, in the complaint, that it was not returned, which at the time, it was not. Because at the time . . . as of the time of the complaint, it had not . . . It definitely was not. And, I suppose, again, the problem is that they're so enamored of their arbitration clause and protecting it, that the fact that maybe there was no contract at all, or the contract had been rescinded, or something like that, would be a merits question that would have to be decided by the court, if the court is supposed to decide it. But, the issue here is a prior question of, does this go to arbitration? And, that turns on something else. Correct. Again, this is the first we've heard of this idea of mutual mistake. Yeah, I think I just made that up. I don't see it in terms of both the understanding of the parties and the fact that we're relying on the terms and conditions that was given post-sale in order to create the argument. Thank you, Your Honors. Thank you, Mr. Kline. Mr. Winthrop, you have a couple of minutes. Thank you, Your Honor. Mr. Kline said that the language that Square Trade refunds the purchase price if there's a mistake came in the subsequent arbitration, subsequent contract, the one that was emailed. That's not the case. If you look at Joint Appendix 101, it's the same language. That was not a change that was made. That's been there. It does say in paragraph 83 of their complaint that Square Trade never refunded the purchase price. They are correct that it didn't happen until after the case was filed. It's a long story. There was confusion between Mr. Stark and the manager. I think they wanted Mr. Stark to call and discuss this, and that never happened. And so it kind of fell by the wayside. He sued. They credited his account. They sent him a gift card, whatever it was. It was something like that. They gave back his money. And what I was told was that he accepted that. And that's consistent with their policy. It's typical in insurance-like agreements. If there's no coverage ab initio, you give back what was taken. That's part of the way you do this. There was a comment about the phrase terms and conditions was never used, only the term warranty. If you look at the Uber case, that was an issue in the Uber case. One link said terms of service. Another said terms and conditions. The court did not give that much notice, that consumers understand this is language of contract. One of the questions was, I think, Your Honor, you said, well, how do we know he didn't see any of this stuff? If you look at the Uber case, the Uber case, in that case, Mr. Meyer expressly attested that he did not see the link, the terms and conditions. And the court, nonetheless, said it didn't matter. In this case, if you look at Mr. Stark's declaration, it's very interesting. He says a lot of things. He doesn't deny that he saw the terms and conditions link. There's no dispute, I believe, that he was on actual notice. Of that terms and conditions link. And that was important in the Meyer case. Mr. Klein talked about, you know, we lost the ability to give reasonable notice because it wasn't temporal. In this case, this all happened in a day. If you look at the complaint, look at Mr. Stark's declaration, he buys from Amazon. It says right there, the contract's going to come in an e-mail. He gets a confirmation from Amazon. It says right there, contract's going to come in an e-mail from Square Trade. Same day, e-mail. Comes from Square Trade right there with the e-mail with the link. That is temporal. If you look at the cases, if you look at Schnabel, for example, it went the other way because there was no notice that anything subsequent was going to come. But the court had no problem with the idea that if you tell somebody, contract's coming in an e-mail, and it comes in an e-mail, and there's a link, that certainly is enough to give the consumer notice. And it ties into the idea that you have to read these contracts, or at least you're on notice of having received them. Thank you, Mr. Winthrop. Your time has expired. Thank you both, and we'll reserve decision.